Lisa GAMBILL, Defendant–Appellant,

v.

STATE of Indiana, Plaintiff–Appellee.

No. 77S00–9507–CR–861.

Supreme Court of Indiana.

Dec. 18, 1996.

Rehearing Denied March 18, 1997.

Joseph K. Etling, Terre Haute, for defendant–appellant.

Pamela Carter, Attorney General of Indiana, Jodi Kathryn Rowe, Deputy Attorney General, Indianapolis, for plaintiff–appellee.

SELBY, Justice.

After the drowning death of her five-year-old son, Appellant Lisa Gambill was charged with murder. A jury found her Guilty but Mentally Ill, and the trial court sentenced her to the maximum possible sentence, sixty years. Appellant raises the following issues in this direct appeal.

1. Was there evidence sufficient to support the verdict of "Guilty but Mentally Ill?"

2. Did the trial court commit reversible error in rejecting the Appellant's requested jury instructions on insanity, circumstantial evidence, and burden of proof?

3. Does the verdict "Guilty but Mentally Ill" violate the Indiana and U.S. Constitutions?

4. Was Appellant's sixty-year sentence appropriate?

We answer the first issue in the affirmative and the last three in the negative. Therefore, Appellant's conviction will stand, but with a reduced sentence.

### FACTS

Appellant was a twenty-five-year-old mother of three children, including the victim, Jordan Jones, age five. In July of 1994, Appellant began behaving strangely. She became obsessed with religious ideas, although she had never been particularly religious before. For at least three weeks prior to the killing, Appellant was acting in a manner consistent with a schizophrenic person suffering through a psychotic episode. Describing Appellant's behavior during this period, her mother testified that one time she found Appellant lying in a graveyard covered in dirt. Appellant pointed at a gravestone which had fallen over and told her mother that a baby was trapped beneath the gravestone. Also during this period, Appellant suffered from mood swings, and claimed to see spirits and angels, and to hear bells. Appellant was inordinately concerned, in a non-rational manner, with the Bible. She believed that, when she read the Bible, passages were highlighted conveying special messages only to her. Appellant manifested an array of symptoms typically associated with schizophrenia.

During this period, she established new friendships, particularly with Brandi Wallace

and Ms. Wallace's brother, Rick Wallace. She used methamphetamine several times. In early August, 1994, Brandi Wallace and her son moved in with Appellant in Appellant's home, located in the town of Shelburn, in Sullivan County, Indiana. On August 12, 1994, Appellant renewed her relationship with a former boyfriend, John Krumreich. That afternoon, Krumreich and Appellant together used methamphetamine.

The next day, August 13, 1994, Appellant, John Krumreich, Brandi and Rick Wallace, and Appellant's five-year-old-son Jordan were all at Appellant's home. Krumreich talked with Appellant about seeking psychiatric help, but Appellant rejected his suggestion. Around 2:00 p.m. that afternoon, Krumreich and Appellant again used methamphetamine. Around 6:00 p.m. that evening, Krumreich and Appellant drove to a local Wal–Mart, where they ingested more methamphetamine. Returning home, Krumreich and Appellant began arguing. Soon thereafter, Appellant and Brandi Wallace became involved in an animated argument. Appellant told Brandi Wallace that she thought they were all devils; Appellant called Krumreich a sinner. Krumreich grabbed her, apparently in an attempt to calm her. A struggle ensued, Krumreich finally wrestling Appellant to the floor. Appellant then advised the group that she had just experienced an apparition of the Virgin Mary. Krumreich asked someone to call the police and an ambulance. Apparently laboring under the psychotic delusion that Krumreich and Wallace were planning to sacrifice her and her son Jordan, Appellant escaped from the home with Jordan. Police, responding to a call, came to Appellant's home and immediately began searching for Appellant and Jordan.

A short time later, Rick Wallace saw Appellant and Jordan on a neighbor's porch. Appellant walked away from the porch and toward a nearby pond. A witness for the State, jailhouse informant Nicole Plew, testified as to what Appellant did next. Appellant took Jordan to the pond. They hid there, together, while Jordan asked his mother if they could go to Grandma's house. Appellant then decided that she was not going

to let "them" kill Jordan; rather, she decided, she would do it herself. Appellant brought Jordan into the water, then repeatedly shoved Jordan under the water. Jordan fought back, striking out at his mother's legs. He cried out "No, Mommy, no." (R. at 1306.) Finally, Jordan's body went limp.

Appellant carried Jordan's body back out of the pond and made an effort to revive him, to no avail. Appellant told Plew that she then left Jordan's body and walked away from the pond. Appellant looked up at the sky, saw angels there, and knew that Jordan was with the angels, and she was with Jesus. She removed her clothing to prepare for the coming of Jesus.

A few minutes later, around 9:40 p.m., Appellant appeared at the door of a nearby home. An individual inside the home heard the storm door rattle and turned to see Appellant standing naked in the living room. Appellant stated in a calm voice, "Pardon me you gotta help me." (R. at 1083.) She pulled an afghan off the couch, covered herself, and repeatedly requested: "You've gotta help me I've just killed my son, I need something to kill myself with." (R. at 1084–85.) The individual inside the home called the police, and Appellant became very upset, her tone becoming forceful. "I'm from Jesus of Nazareth ... and I've just killed my son because they were going to sacrifice him." (R. at 1086.) Appellant then walked into a bedroom. When the individual caught her, she began to struggle. Appellant kept repeating "I gotta kill myself." (R. at 1087.) The individual removed Appellant from the home, and Appellant fled.

The individual's call to the police precipitated a massive search for Jordan. Around 3:15 a.m. the next morning, police found Jordan's body. At 5:00 a.m., an individual on an early morning drive came across Appellant. Appellant asked for a ride home, stating "they beat and they raped me" and that her boyfriend had hurt "Georgie." (R. at 1195.) The driver, aware that authorities were looking for Appellant, took her to her parent's home. Appellant, crying when she arrived, told her family that "they" had killed Jordan.

Appellant was placed under arrest and hospitalized.

Appellant was charged with murder. At trial, Appellant raised the defenses of insanity and intoxication. Although four expert medical witnesses testified that Appellant was unable to appreciate the wrongfulness of her conduct at the time of the offense, and was therefore legally insane, the jury discounted Appellant's insanity and intoxication defenses and returned a verdict of Guilty but Mentally Ill.

## DISCUSSION AND DECISION

### I. Sufficiency of the Evidence

#### A. Insanity Defense

■ Appellant first challenges the evidence supporting her conviction. Appellant argues that the jury's verdict of Guilty but Mentally Ill is contrary to law, because she claims to have demonstrated at trial that she was insane. Her insanity defense should have prevailed, she argues, and therefore her conviction cannot stand.

There is, in the record, ample evidence to support the jury's determination that the Appellant was not insane, but was Guilty of Murder but Mentally Ill. Indiana Code Section 35–41–3–6 provides for the insanity defense, a defense Appellant interposed at trial:

(a) A person is not responsible for having engaged in prohibited conduct if, as a result of mental disease or defect, he was unable to appreciate the wrongfulness of the conduct at the time of the offense.

(b) As used in this section, "mental disease or defect" means a severely abnormal mental condition that grossly and demonstrably impairs a person's perception, but the term does not include abnormality manifested only by repeated unlawful or antisocial conduct.

I.C. § 35–41–3–6.

■ The burden rests with the defendant to prove, by a preponderance of the evidence, the affirmative defense of insanity. I.C. § 35–41–4–1(b); *Lyon v. State,* 608 N.E.2d 1368, 1370 (Ind.1993). A determination of insanity is a question for the trier of fact. "The jury is free to disregard the testimony of experts and rely upon that of lay witnesses." *Barany v. State,* 658 N.E.2d 60, 63 (Ind.1995). A jury is not obligated to believe expert testimony on the issue of insanity, *Bonham v. State,* 644 N.E.2d 1223, 1227 (Ind.1994), and may consider lay opinion testimony on the issue of sanity. *Haggard v. State,* 537 N.E.2d 28, 29 (Ind.1989); *Bonham,* 644 N.E.2d at 1227. "Accordingly, the standard of review is a deferential one." *Barany,* 658 N.E.2d at 63. A convicted defendant who claims that his insanity defense would have prevailed at trial is in "the position of one appealing from a negative judgment," and such a judgment will be reversed "only when the evidence is without conflict and leads to but one conclusion which the trier of fact did not reach." *Metzler v. State,* 540 N.E.2d 606, 610 (Ind.1989); *Barany,* 658 N.E.2d at 63–64.

Such an evidentiary conflict exists in this case. Although all four of the expert medical witnesses at this trial testified that Appellant was legally insane at the time of the murder, two lay witnesses testified otherwise. These witnesses testified that, in their opinions, the Appellant was able to appreciate the wrongfulness of her actions at the time the offense occurred. Sergeant Pierce, who had attended high school with Appellant, testified that after spending time with Appellant at the hospital on the morning after the murder, he believed that Appellant was able to appreciate the wrongfulness of her conduct. Also, the jail-house informant Nicole Plew testified that she believed that Appellant knew it was wrong to drown Jordan. Thus, there was a conflict of opinion on the question of Appellant's ability to appreciate the wrongfulness of her conduct. This being so, the conflict in the evidence was sufficient for the jury to determine that Appellant could appreciate the wrongfulness of her conduct, and the jury, acting within its power, disregarded the expert testimony. *Bonham,* 644 N.E.2d at 1227.

Additionally, Appellant failed to disclose to medical personnel that, in the hours before she took her son's life, she had ingested a substantial quantity of methamphetamine. Appellant lied to the individual who found her wandering on the street early on the

morning after the murder. She told him that she had been beaten and raped, and that a former boyfriend had hurt her son. Such self-serving exculpatory statements might indicate to the jury that Appellant was aware of the wrongfulness of her actions. As such, there was sufficient evidence in the record for the jury to reject the Appellant's insanity defense.

We note that the jury's determination that Appellant was mentally ill is not, in itself, support for her argument that she proved by a preponderance her insanity. Not all mental conditions are serious enough to relieve one of criminal responsibility. *Cate v. State*, 644 N.E.2d 546, 547 (Ind.1994). A diagnosis of mental illness is not in itself a defense to a crime. To rise to the level of a defense, the illness must be so severe as to render the defendant unable to appreciate the wrongfulness of the criminal conduct. *Higgins v. State*, 601 N.E.2d 342, 343 (Ind. 1992). The jury acted within the scope of its authority in rejecting Appellant's insanity defense.

### B. Intoxication Defense

Appellant presents an alternative defense, arguing that she was so drug intoxicated at the time of the killing that she was unable to form the requisite state of mind to be convicted. On appeal, she argues that the State failed to adequately counter this defense, and that, therefore, she is entitled to relief.

The issue with regard to voluntary intoxication is not whether the defendant was intoxicated but whether the intoxication was so severe as to prevent her from forming the state of mind necessary to commit murder. *Weaver v. State*, 643 N.E.2d 342, 344 (Ind. 1994); *Ferguson v. State*, 594 N.E.2d 790, 792 (Ind.1992). A defense of intoxication will not succeed where the defendant is able to devise a plan to commit the crime or appreciate the wrongfulness of her conduct. *Terry v. State*, 465 N.E.2d 1085, 1088 (Ind.1984); *Pierce v. State*, 640 N.E.2d 730, 733 (Ind.Ct. App.1994).

When addressing a sufficiency of the evidence issue, we will affirm the conviction if, considering only the probative evidence and reasonable inferences supporting the verdict, without weighing evidence or assessing witness credibility, we conclude that a reasonable trier of fact could find each element of the charged crime proven beyond a reasonable doubt. *Weaver*, 643 N.E.2d at 343–44. If there is sufficient evidence to establish that the defendant was not so intoxicated as to be unable to form the necessary mens rea, the conviction will stand. *Id.*

There is evidence in the record to permit the jury to infer that the Appellant may have been under the influence of methamphetamine at the time she drowned her son. Nevertheless, there is also ample evidence in the record to permit the jury to conclude that Appellant, intoxicated or not, was able to appreciate the wrongfulness of her conduct when she drowned her son. Evidence in the record would permit the jury to conclude that, after deciding to kill her son, she took him into a pond, knowingly held him beneath the water as he struggled, and continued, knowingly, to hold him there until he stopped struggling. No evidence supports the proposition that, due to intoxication, Appellant was unable to form the state of mind necessary to do the act which resulted in the death of her son. The jury acted reasonably on the evidence before it when it determined that Appellant's intoxication did not prevent her from knowingly killing her son. *See Id.* at 344.

### C. Guilty but Mentally Ill

Appellant next argues that the evidence was insufficient to support the jury's verdict of Guilty but Mentally Ill. It is within the province of the jury to judge the credibility of the witnesses. *Chambers v. State*, 590 N.E.2d 1064, 1066 (Ind.1992); *Maynard v. State*, 513 N.E.2d 641, 644 (Ind. 1987). When a defendant challenges the sufficiency of the evidence supporting a conviction, we will affirm the conviction if, considering only probative evidence supporting the verdict, and reasonable inferences therefrom, we conclude that a reasonable trier of fact could find the existence of each and every element of the charged crime exists beyond a

reasonable doubt. *Greenlee v. State*, 655 N.E.2d 488, 492 (Ind.1995); *Vance v. State*, 640 N.E.2d 51, 57 (Ind.1994). A conviction may be supported by circumstantial evidence alone. *Davis v. State*, 598 N.E.2d 1041, 1045 (Ind.1992), *cert. denied*, 510 U.S. 948, 114 S.Ct. 392, 126 L.Ed.2d 340 (1993); *Sayles v. State*, 513 N.E.2d 183, 186 (Ind.Ct.App.1987). "It is for the trier of fact to determine the weight of the evidence and credibility of the witnesses." *Tiller v. State*, 541 N.E.2d 885, 893 (Ind.1989).

Both the direct and circumstantial evidence in this case support the jury's determination that Appellant knowingly drowned her son. While the Appellant points out that no expert testimony supports the conclusion that the Appellant knowingly killed her son, that several lay witnesses testified to Appellant's bizarre behavior, and that there was uncontroverted testimony that Appellant loved her son and would never knowingly hurt him, other probative evidence supports the jury's verdict. For instance, Appellant told jail-house informant Plew that she drowned her son. Also, immediately after she killed her son, Appellant walked into a stranger's house and stated that she had just killed her son, demonstrating that she knew what she had done. The jury was free to disbelieve the experts and to credit the testimony of the stranger and Plew. This evidence was sufficient to permit the jury to infer that Appellant knew that she was killing her son at the time she drowned him.

## II. Jury Instructions

▉▉▉▉ Appellant next claims that the trial court gave erroneous instructions to the jury. When we review the propriety of a jury instruction, this Court first considers whether the tendered instruction is a correct statement of the law. We next determine whether there was sufficient evidence presented to support the giving of the instruction. Finally, we examine all the instructions to determine whether the tendered instruction is covered by other instructions given. *Reinbold v. State*, 555 N.E.2d 463, 466 (Ind. 1990); *Phillips v. State*, 550 N.E.2d 1290, 1301 (Ind.1990). Further, jury instructions are not to be considered in isolation, but as a whole and with reference to each other.

*Jewell v. State*, 539 N.E.2d 959, 961–62 (Ind. 1989). We conclude that there was no error in the court's refusal to give any of the instructions tendered by Appellant. We briefly enumerate each one of these below.

### A. Insanity Defense

▉▉▉▉ The trial court refused to give Appellant's tendered insanity instruction. The tendered instruction provided:

Ladies and gentleman, the Defendant has raised the defense of Insanity. Under a plea of not guilty by reason of insanity, the issue is the Defendant's state of mind at the time of the offense. The duration of any mental disease or defect is of no consequence provided that it existed at the moment of the offense.

(R. at 178.) The court rejected this instruction, in its place giving Instruction Number Twenty Three:

Temporary insanity is recognized by law as well as insanity of a longer period.

It is not necessary for the defense to show the defendant had a prior history of mental illness, nor to show she is still suffering from a continuing mental disease or defect. These are just some circumstances which you may consider with all other circumstances to determine whether the defendant was legally responsible for her actions on August 13, 1994.

(R. at 205.)

Appellant argues that the court erred when it gave Final Instruction Number Twenty Three because the instruction fails to advise the jury that they need only conclude that the defendant was insane at the time of the offense. Examining the jury instructions as a whole, however, we see that the jury did receive the substance of Appellant's tendered instruction. The court instructed the jury, via Instruction Numbers Eighteen, Nineteen, and Twenty Two, that the jury must determine that Appellant was insane at the time of the offense. Instruction Eighteen includes the paragraph, "The defendant has also raised the defense of insanity. On the issue of insanity, the burden rests upon the defendant to prove to each of you, by a preponderance of the evidence, that she was not re-

sponsible by reason of insanity *at the time of the offense charged.*" (R. at 200.) (Emphasis added.) Instruction Nineteen informed the jury:

The defense of insanity is defined by law as follows:

A person is not responsible for having engaged in prohibited conduct if, as a result of mental disease or defect, she was unable to appreciate the wrongfulness of the conduct *at the time of the offense.*

"Mental disease or defect" means a severely abnormal mental condition that grossly and demonstrably impairs a person's perception, but the term does not include an abnormality manifested only by repeated unlawful or anti-social conduct.

(R. at 201.) (Emphasis added.) Instruction Twenty Two added, "However, in this case on the sole issue of not responsible by reason of insanity the defendant has the burden of proving she was insane *at the time of the act* charged by a preponderance of the evidence." (R. at 204.) (Emphasis added.) Thus, because as a whole the instructions conveyed to the jury that they need only find the defendant insane at the time of the offense, the trial court did not err in failing to give Appellant's tendered insanity instructions. *See Reinbold v. State*, 555 N.E.2d 463, 466 (Ind.1990); *Jewell v. State*, 539 N.E.2d 959, 961–62 (Ind.1989).

### B. Circumstantial Evidence

 Appellant next challenges the court's decision to refuse Appellant's tendered circumstantial evidence instruction. The tendered instruction provided:

Direct evidence means evidence that directly proves a fact, without an inference, and which in itself, if true, conclusively establishes that fact. Circumstantial evidence means evidence that proves a fact from which an inference of the existence of another fact may be drawn.

An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts.

It is not necessary that facts be proved by direct evidence. Both direct evidence and circumstantial evidence are acceptable as a means of proof.

*However, circumstantial evidence alone will not justify a finding of guilt unless the circumstances are entirely consistent with the Defendant's guilt, wholly inconsistent with any reasonable theory of the defendant's innocence, and are so convincing as to exclude a reasonable doubt of the defendant's guilt.*

(R. at 180.) (Emphasis added.) Instead, the court gave the following instruction, identical but for the section in italics:

Direct evidence means evidence that directly proves a fact, without an inference, and which in itself, if true, conclusively establishes that fact. Circumstantial evidence means evidence that proves a fact from which an inference of the existence of another fact may be drawn.

An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts.

It is not necessary that facts be proved by direct evidence. Both direct evidence and circumstantial evidence are acceptable as a means of proof. *Where proof of guilt is by circumstantial evidence only, it must be so conclusive in character and point so purely and unerringly to the guilt of the accused as to exclude every reasonable theory of innocence.*

(R. at 194.) (Emphasis added.)

The Appellant argues that the proposed instruction was a more complete and correct statement of the law than the instruction given. Although the tendered instruction is a correct statement of the law, the given instruction adequately covers the substance of the tendered instruction. *Reinbold v. State*, 555 N.E.2d 463, 466 (Ind.1990). As we held in *Myers v. State*, 532 N.E.2d 1158, 1159 (Ind.1989), a defendant is entitled to an instruction which states that when proof of guilt is attempted by circumstantial evidence alone, the circumstances must exclude all reasonable hypothesis of innocence. *See also Hall v. State*, 273 Ind. 507, 405 N.E.2d 530, 534 (1980) (finding instructions similar to both those quoted above to be correct statements of the law).

## C. Preponderance of the Evidence

■ Appellant argues that the trial court committed error in refusing to give her tendered preponderance of the evidence instruction. Appellant's tendered instruction provided:

> The phrase "preponderance of the evidence" means whether, considering all the evidence in this case on the sole issue of insanity on which the Defendant has the burden of proof is more probably true than not true.
>
> Therefore, if you find that Defendant, Lisa Gambill, was probably unable to appreciate the wrongfulness of her conduct as a result of a mental disease or defect, then you must find the Defendant, Lisa Gambill, not guilty.

(R. at 181.) The court's final instruction on this issue was as follows:

> Preponderance of the evidence, as it applies to the issue of insanity, means that you must be convinced from a consideration of all the evidence in the case that the defendant was more probably insane than sane. The number of witnesses testifying on that issue for one side or the other is not necessarily of the greater weight. Evidence which convinces you most strongly of its truthfulness is of the greater weight.

(R. at 202.)

Appellant challenges the instruction given by the trial court as unclear and an inadequate statement of the law which acted to confuse the jury. We disagree. The instruction given is a correct statement of the law. The instruction properly defined "preponderance of the evidence." *Van Orden v. State,* 469 N.E.2d 1153, 1159 (Ind.1984); *Emory v. State,* 420 N.E.2d 883, 885 (Ind.1981). Further, the instruction properly discussed the application of the preponderance of the evidence standard as it applies to the issue of insanity. The court did not err in declining to give the tendered instruction.

### III. Constitutionality

Appellant next challenges the constitutionality of Indiana Code Section 35–36–2–3. That statute designates, in all cases in which the defense of insanity is interposed, four possible verdicts: (1) Guilty, (2) Not Guilty, (3) Not Responsible by Reason of Insanity, or (4) Guilty but Mentally Ill at the Time of the Crime.

Another provision of the Indiana Code, Section 35–36–2–5 provides that, where a defendant is found Guilty but Mentally Ill, the sentencing court shall sentence that individual in the same manner as a defendant found Guilty of the offense. Thus, the Guilty but Mentally Ill verdict invokes no special sentencing scheme. The only special consideration given to the Guilty but Mentally Ill defendant is set out in Section 35–36–2–5(b) which provides that such a defendant is to receive evaluation and treatment as is psychiatrically indicated for that defendant's mental illness. Appellant argues that the verdict Guilty but Mentally Ill at the time of the offense is violative of her equal protection rights under Indiana Constitution Article 1 Section 23, and under the Equal Protection Clause of the 14th Amendment to the United States Constitution.

Appellant suggests that the option of finding a defendant Guilty but Mentally Ill offers nothing substantive over a verdict of guilty. Appellant argues that, if a defendant is guilty of a crime, that is, if the state proved each element of the crime beyond a reasonable doubt, then the defendant should receive a verdict of guilty. However, if a defendant is unable to know the wrongfulness of her actions because of mental disease or defect, then she is unable to form the requisite state of mind necessary to commit a crime, and is therefore not guilty. Appellant claims that the alternative verdict offends both the Indiana and the United States Constitutions.

Appellant argues that the Guilty but Mentally Ill verdict purports to offer the jury a middle ground, when in fact there is no middle ground. She suggests that the Guilty but Mentally Ill alternative prejudiced her right to equal protection because the verdict specifically targets the small class of mentally ill individuals who commit a crime because those individual's mental illness prevents them from comprehending the wrongfulness of their conduct.

Appellant acknowledges, however, that this Court has previously identified the legitimate state interest served by the Guilty but Mentally Ill verdict option. In *Taylor v. State,* we held:

Our legislature has now provided jurors with an alternative verdict, an intermediate ground, which embodies the circumstance long recognized in the law—the defendant who suffers from a mental illness or deficiency yet remains capable of appreciating right from wrong and conforming his conduct to the requirements of the law.

The "guilty but mentally ill" verdict serves the state's interest in securing convictions justly obtained and in obtaining treatment for those convicted defendants who suffer mental illness. The classification is thus one which is reasonably related to a legislative purpose, as is necessary to withstand an equal protection attack.

*Taylor v. State,* 440 N.E.2d 1109, 1112 (Ind. 1982).

■ Appellant argues that the verdict offends the privileges and immunities clause of the Indiana Constitution. There is a strong presumption that legislation effecting the rights of an ascertainable class is constitutional. "Presuming the statute to be constitutional, courts place the burden upon the challenger to 'negative every conceivable basis which might have supported the classification.'" *Collins v. Day,* 644 N.E.2d 72, 80 (Ind.1994) (citing *Johnson v. St. Vincent Hospital, Inc.,* 273 Ind. 374, 404 N.E.2d 585, 597 (1980)).

As recently stated in *Collins:*

Legislative classification becomes a judicial question only where the lines drawn appear arbitrary or manifestly unreasonable. So long as the classification is based upon substantial distinctions with reference to the subject matter, we will not substitute our judgment for that of the legislature; nor will we inquire into the legislative motives prompting such classification.

*Collins,* 644 N.E.2d at 80 (citing *Chaffin v. Nicosia,* 261 Ind. 698, 701, 310 N.E.2d 867, 869 (1974)).

We recently clarified our equal protection analysis under the Indiana Constitution. In *Collins,* we conclude that where a statute grants unequal privileges or immunities to differing classes of persons, there are two requirements which must be met to determine if a statute is in accord with the Indiana Constitution:

First, the disparate treatment accorded by the legislation must be reasonably related to inherent characteristics which distinguish the unequally treated classes. Second, the preferential treatment must be uniformly applicable and equally available to all persons similarly situated.

*Collins,* 644 N.E.2d at 80.

Indiana Code Section 35–36–2–3 does not offend the Indiana privileges and immunities clause. The verdict option of Guilty but Mentally Ill creates a classification of persons, those who are mentally ill and commit crimes, but who also appreciate the wrongfulness of their conduct. The treatment accorded this class of persons, under Indiana Code Section 35–36–2–5, is reasonably related to the inherent characteristic shared by all in the class, mental illness. The verdict option is a pathway to treatment which is uniformly applicable and equally available to all persons who are found Guilty but Mentally Ill at the time the person commits the offense. Accordingly, the statute does not deny equal protection under Article 1, Section 23 of the Indiana Constitution.

■ Nor does the statute deny Appellant the equal protection afforded her via the Fourteenth Amendment to the United States Constitution. We have, on three prior occasions, held that the statute has a rational relationship with a legitimate state interest. *Smith v. State,* 486 N.E.2d 465 (Ind.1985); *Green v. State,* 469 N.E.2d 1169 (Ind.1984); *Taylor v. State,* 440 N.E.2d 1109 (Ind.1982). Application of the statute in this case comports with the Equal Protection Clause of the Fourteenth Amendment.

### IV. Sentence

■ Appellant next challenges the propriety of her sixty year sentence claiming it was manifestly unreasonable. Appellant brings to our attention a case in which a defendant who killed her ten year old daugh-

ter was adjudicated Guilty but Mentally Ill and received a sentence less than Appellant's sixty year sentence. *Green v. State,* 469 N.E.2d 1169 (1984). *See also Smith v. State,* 502 N.E.2d 485 (1987); *Reed v. State,* 479 N.E.2d 1248 (1985); *Montano v. State,* 468 N.E.2d 1042 (1984). The Indiana Constitution requires that a sentence be proportional to both the nature of the offense and the character of the offender. The constitutional requirement that a sentence be proportionate both to the offense and to the offender does not require us to compare, as Appellant would have us do, her sentence to the sentence of others convicted of the same crime. *Willoughby v. State,* 660 N.E.2d 570, 584 (Ind.1996).

■ The trial court appropriately articulated the reasons for selecting the sentence imposed. The aggravating circumstances cited by the trial court included: (1) prior criminal history consisting of four misdemeanors in three years, (2) victim under 12 years of age, and (3) that the imposition of any lesser sentence would depreciate the seriousness of the crime. The statutory aggravator "imposition of a reduced or suspended sentence would depreciate the seriousness of the crime," I.C. § 35–38–1–7.1(b)(4), cannot be used to support an enhanced sentence. *Barany v. State,* 658 N.E.2d 60, 67 (Ind. 1995).

There was overwhelming testimony that Appellant was gravely mentally ill at the time of the drowning. She had recently begun having religious visions and had, immediately prior to the drowning, accused her friends of being devils. She believed Jesus was with her after her son's death and approached a stranger completely naked. All the experts testified to the diagnosis of paranoid schizophrenia.

Appellant's mental illness, while not a defense to the crime, is of substantial mitigating value. There was also testimony from Appellant's sister that Appellant would never knowingly hurt her son. Because of the special circumstances of this case, the Appel-

lant is unlikely to commit another crime of this nature. We reduce Appellant's sentence on her murder conviction to a term of forty years, and remand for a sentencing order in accord with our decision.[1]

### CONCLUSION

Appellant Lisa Gambill's conviction is affirmed. Her sentence is reduced to forty years.

SHEPARD, C.J., and DICKSON, SULLIVAN and BOEHM, JJ., concur.

---

1. Appellant points out that, at the time of Appellant's sentencing, the Indiana Code included two different versions of the penalty to be imposed for murder. There is no need to resolve the issue of under which version Appellant should have been sentenced because under either version Appellant is sentenced to a term of forty years.